**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| ex rel Scott Barrett and Marie | § | |
| Goodwin, *et al.,* | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-98-861 |
| | § | |
| | § | |
| COLUMBIA HEALTHCARE CORP., | § | |
| *et al.,* | § | |
| Defendants. | § | |

## MEMORANDUM AND OPINION

This case is on remand from a Multi-District Litigation transferee court, for resolution of the only claims not resolved in the MDL proceeding.  Plaintiff Marie Goodwin alleged that she was wrongfully fired from her job as an office manager for an outpatient surgical facility, Gramercy Surgery Center, Ltd., for internally reporting and refusing to participate in certain billing and accounting practices, which Goodwin and a co-relator later made the basis of a *qui tam* action.  Goodwin sued Gramercy Surgery Center, Ltd. and its corporate parents, Columbia/HCA Healthcare Corp., Surgicare of Gramercy, Inc., and Columbia/HCA Healthcare Corp. of Central Texas, including in her causes of action retaliation under section 3730(h) of the False Claims Act, 31 U.S.C. § 3730 *et seq.,* and wrongful discharge and intentional infliction of emotional distress under Texas common law.  After remand from the MDL court, defendants moved for summary judgment on these causes of action.  (Docket

Entry No. 55).  Goodwin has responded, (Docket Entry No. 66), and defendants replied. (Docket Entry No. 72).  Both sides have supplemented their summary judgment papers. (Docket Entry Nos. 67, 82, 83).

Based on a careful review of the motion, response, supplements and replies; the summary judgment evidence; the record; and the applicable law, this court GRANTS defendants' motion for summary judgment and, by separate order, enters final judgment.  The reasons are stated below.

## I.    Background

This lawsuit began as an action under the *qui tam* provisions of the False Claims Act, 31 U.S.C. §§ 3729–3730.  Scott Barrett, Goodwin's supervisor at the Gramercy Surgical Center in Houston, Texas, filed this suit in March 1998.  As the Act requires, the suit was filed under seal to provide the United States an opportunity to investigate  and decide whether to intervene.  31 U.S.C. § 3730(b)(3).  Nearly two years later, the panel on Multi-District Litigation transferred this case to the federal District Court for the District of Columbia.  (Docket Entry No. 3).  In March 2001, the United States declined to intervene. (Docket Entry No. 8).  In 2003, the MDL transferee court granted defendants' motion to dismiss in part, (Docket Entry No. 29), and remanded the remaining claims.  (Docket Entry No. 33).

A proper evaluation of Goodwin's claims requires a review of the factual and procedural background that led to the present motion.

### A.    Factual Background

Goodwin worked as the Business Operations Manager[1] for the Gramercy Surgery Center, an outpatient surgical facility, from January 1993 until January 1997.  When Goodwin began working at Gramercy, she reported to Dean Sullivan, the administrator.  At that time, Medical Care International owned Gramercy.  Columbia/HCA Healthcare Corp. acquired Gramercy in 1994.  Goodwin continued to work as the Business Operations Manager.  (Docket Entry No. 66, att. 1 (Goodwin Aff.), ¶ 2).  Scott Barrett became the administrator of Gramercy at the end of 1995, and Goodwin reported directly to him.  (*Id.*, att. 2 (Barrett Aff.), ¶ 1).

In addition to Columbia/HCA, some doctors who performed procedures at Gramercy also held an ownership interest in the facility.  The doctors held their ownership interest both directly and indirectly, through a group known as Houston Eye Associates.  Barrett described Gramercy's ownership structure as follows: Columbia/HCA (69.75 percent); Houston Eye Associates (21 percent); Dr. Earle (4 percent); Dr. Garrett (2.5 percent); Dr. Hittner (2 percent); and Dr. Quayle (.75 percent).  (*Id.,* ¶ 2).  Columbia/HCA operated Gramercy and another Houston-area surgical clinic called Travis, or "TOPS," through its Ambulatory Surgery Division, or "ASD."  ASD operated numerous medical facilities in Texas, Louisiana, Florida, and Oklahoma, with different vice-presidents overseeing different regions of Texas.  Greg Beasley and Carla Holden were both ASD vice-presidents who oversaw Texas facilities

---

[1]        Her position was also called Business Office Manager.  Goodwin received a promotion and change in title at some point, but her material duties did not change.

and, at different times, the two Houston clinics.  (Docket Entry No. 83, att. 19, exh. 3 to Holden Dep.).  Each clinic had a separate  administrator until December 1996, when Carol Simons, the Travis administrator, became administrator for both Travis and Gramercy. Clinic administrators reported to Columbia/HCA "corporate" officers at different headquarters in Houston, Dallas, and Nashville.  Each clinic also had a business operations manager – the position Goodwin held at the Gramercy clinic – to handle financial and accounting matters.  The business operations manager for each clinic reported to that clinic's administrator and to Columbia/HCA regional chief financial officers.

Even before Columbia/HCA took over Gramercy, Goodwin had "concern[s]" about certain of Gramercy's pricing practices.   Goodwin reported these concerns to the administrator who preceded Barrett, Dean Sullivan.  The practices that troubled Goodwin included: (1) waiving copays and deductibles for Medicare/Medicaid- and privately-insured patients; (2) falsifying procedure codes in order to maximize recovery from insurers; (3) entering  agreements with physicians for equipment leases and staff salaries that would benefit the physician but not the clinic; (4) charging patients different prices for the same procedures, depending on the responsible party or insurer to be charged; and (5) collecting insurance overpayments and converting them to income rather than refunding them. Goodwin's affidavit states:  "I voiced her [sic] disapproval of these practices, stating she [sic] felt the special pricing and medicare practices might be illegal."  (Goodwin Aff., ¶ 3).  When Goodwin raised these concerns to Sullivan,  she "was instructed to continue doing business as usual."  (*Id.*).

After Columbia/HCA acquired its interest in Gramercy and took over its operations, the physicians who had an ownership interest in Gramercy remained on the board of directors and on other Gramercy committees.  According to Goodwin, several of these doctors "were benefitting from certain arrangements with the center."

The MDL transferee court described the various "fraudulent schemes" later alleged by the relators, which Goodwin asserts she identified in internal reports to different managers at Gramercy and Columbia/HCA:

> Relators' complaint describes several different fraudulent schemes.  The first involves waiver of the mandatory co-pay.  Medicare pays 80% of the cost of covered services, but requires patients to pay the remaining 20%.  Relators' complaint alleges that Gramercy routinely waived the co-pay, and describes interactions with several named physicians regarding waiver of the co-pay. The next scheme is coding uncovered procedures as covered procedures. Relators include a number of kickback claims, asserting various types of benefits were provided in exchange for patient referrals.  These include: discounting fees for particular physicians to induce them to continue performing procedures at Gramercy; allegations that Gramercy waived the facility fee for a particular physician on one case per month, permitting the physician to collect the facility fee directly from the patient and retain the money, to induce the physician to continue performing procedures at Gramercy; that Gramercy paid an excessive salary to an employee of Houston Eye Associates to induce HEA to send its patients to Gramercy; and that Gramercy leased old, difficult to repair equipment from a physician in order to induce the physician to continue directing patients to Gramercy. The final scheme relates to insurance and Medicare overpayments discovered by Relator Goodwin.  Relators allege that when overpayments from Medicare or insurance companies were discovered, the money was not returned but was retained through fraudulent accounting practices.

*United States ex rel. Barrett v. Columbia/HCA Healthcare Corp.*, 251 F. Supp. 2d 28, 34–35 (D.D.C. 2003) (record citations omitted).  A "free case" was one in which the physician would, without authorization, waive Gramercy's facility fee, unilaterally charge the patient

less than the facility's listed price for a procedure, or collect the facility fee from the patient

for him or herself.  Barrett described the practice:

> The practice, as I understood it, was as a perk, favor, whatever you would like
> to deem it, for Dr. Stewart bringing his patients to Gramercy, he was able to
> do one procedure a month free of charge.  And what I mean "free of charge,"
> there was no — Gramercy did not collect any facility fee or any other
> incidental fee that they were entitled to collect.   Dr. Stewart personally
> collected that himself and kept it to use as he saw fit, and that was an
> inducement for him to bring the rest of his paying business to Gramercy.

(Barrett Dep. at 77).  Goodwin stated, "I felt the free cases and shared employees smelled of

kickbacks, and expressed these concerns to my supervisors in various meetings."  Goodwin's

affidavit does not identify which supervisors, other than Barrett, she alerted or when these

meetings occurred.  (Docket Entry No. 66, (Goodwin Aff.) ¶¶ 4–8).

Discounted cases were those in which certain Gramercy doctors charged different

prices for certain procedures for different patients.[2]  Because Goodwin was the business

operations manager, doctors would ask her to approve the free or discounted procedures; she

incurred the doctors' anger when she refused.  (*Id.*, ¶ 4).   In November 1995, after

Columbia/HCA increased the price Gramercy charged for common procedures, doctors'

demands for price concessions — in the form of free or discounted cases, special pricing, and

waivers of insurance copays and deductibles — increased.   Goodwin asserted, without

identifying where or when, that she told Barrett that she believed some of these practices

---

[2]     Barrett described a situation in which the Dallas corporate headquarters would set the pricing
for various procedures.  Gramercy, however, deviated from the set pricing and had its own list of prices that
it charged various physicians. (Barrett Dep. at 86).  In one specific scenario, one doctor charged $1,100 for
cataract removal for cash-paying patients from Mexico.  This was a discount from what patients paying
through insurance were charged.  (*Id.* at 87).

were illegal, and that Barrett agreed with her.  (*Id.*, ¶ 6).  Goodwin "was uncomfortable continuing to approve them" and issued written notices to prevent doctors from discounting the price they charged for certain procedures or patients, "but the doctors only became angry and went around me to get what they wanted.  When I would oppose them, they would threaten to take their business away."  (*Id.*, ¶ 5–6).

Goodwin testified that from January to December 1996, she and Barrett continued their discussions about what they considered improper or illegal practices at Gramercy. Goodwin testified that from January until December 1996, she and Barrett sought support from his superiors at Columbia/HCA in order "to stop the illegal practices."  (*Id.*, ¶ 6–7). When Barrett sought guidance from Columbia/HCA,  Goodwin supplied him with "information . . . to show what was happening."  In March 1996, Goodwin began a log of pricing concessions, free cases, and fee waivers.  Goodwin stated in her affidavit that she suggested to Barrett that she document these pricing irregularities.  Barrett testified in his deposition that he "probably" instructed Goodwin to keep this log:  "I subsequently have done a study. . . showing the [financial] impact of discounting and this is the type of information that I would have needed to have collected in order to do that."  (Docket Entry No. 66, att. 5 (Barrett Dep.) at 96–97).  "At some point," a date Goodwin did not specify in her affidavit, Goodwin and Barrett agreed that Goodwin should stop discounting procedures and waiving insurance copays and deductibles.  This angered both the physician-owners and the patients to whom the doctors had promised discounts.  Several physicians complained that Goodwin treated their patients rudely and threatened her job on "numerous occasions."

(Docket Entry No. 66, (Goodwin Aff.) ¶ 8).

Goodwin testified that she attempted to alert her Columbia/HCA supervisors about Gramercy's practices on several occasions.  In May 1996, Goodwin attended a "regional meeting in Dallas," which included a session and a memo on Texas law about waiving insurance copayments and deductibles.  At the meeting, Goodwin "was told, 'Be careful how you waive co-pays and deductibles, but ultimately you need to retain your cases, and keep the doctors happy." (*Id.*, ¶ 9).  She does not recall any other details about this warning at the Dallas meeting, such as who said it or whether it was in response to something Goodwin said or independently raised.  Nor does Goodwin remember anything about the memo.  (Goodwin Dep. at 226).[3]  A few weeks after this meeting, Columbia/HCA Regional Vice-President Greg Beasley visited Gramercy.  According to Goodwin, "I informed him I was unwilling to continue to engage in the illegal practices, and that I was not going to be a fall guy for Columbia." (Goodwin Aff., ¶ 9).  That same day, Goodwin participated in a conference call with Beasley, Barrett, and Columbia/HCA Regional Compliance Director Kirk Tenkhoff.  According to Goodwin's affidavit, the parties discussed the potential illegality of discounting prices and waiving copays and deductibles.  "Tenkhoff stated he wanted to run it by corporate and legal.  The call ended with Beasley instructing Scott [Barrett] and I to continue

---

[3]    In his affidavit, Barrett recalled that Goodwin accompanied him to the regional meeting, where "we both asserted the practices violated a memo from corporate."  Barrett also testified that "Beasley instructed me, 'Be careful how you waive co-pays and deductibles, but ultimately you need to retain your cases." (internal close quote missing in original).  Barrett also stated that "I and Marie [Goodwin] informed Beasley that we felt the free cases to Dr. Stewart were illegal."  (Docket Entry No. 66, (Barrett Aff.) ¶¶ 3, 7).  Barrett's and Goodwin's affidavits describe similar events in similar language, although the depositions reveal that Barrett and Goodwin played very different roles in reporting Gramercy's practices.

doing business as usual until he obtained a directive from Corporate."  (*Id.*).

From June through August 1996, Goodwin was "bombarded by physicians with demands for special pricing, and verbally scolded by physicians for trying to collect the proper fees from their patients."  (*Id.*, ¶ 10).  Goodwin testified that she refused to follow doctors' instructions to provide free procedures to some patients by classifying them as indigent.  On one occasion, Goodwin discovered that one doctor repeatedly scheduled his patients for procedures after diagnosing them for a condition covered by insurance, when in fact, he was performing infertility procedures not covered by insurance.  (*Id.*).  In October 1996, Goodwin had a confrontation with a doctor over her refusal to authorize free cases for him.  Goodwin complained to Barrett, who backed Goodwin's decision, but the doctor "did his cases anyway, and collected Gramercy's money from the patient."  (*Id.*, ¶ 14).  According to Goodwin, "corporate refused to issue a written statement" ordering the doctors to stop the practice of performing free cases.  In October 1996, Goodwin refused to authorize any further "special deals" for the physicians.[4]  Her relationship with them worsened.  (*Id.*).

Goodwin also managed an account dedicated to processing insurance overpayments.  Overpayments would stay in this account pending refunds to private insurers or to the

---

[4]     In her affidavit, Goodwin states, "At some point after Scott Barrett became administrator, we agreed I should stop discounting and waiver of co-pays and deductibles."  (*Id.*, ¶ 8).  It is unclear if Goodwin resumed discounting and waiving copays and deductibles, then stopped again in October 1996. Barrett testified in his deposition that in the first six months of his tenure, he and Goodwin discussed the dual fee schedule and copay waivers.  He did not recall whether they considered the practice a "concern" or a "problem," just that they discussed it.  Barrett did not recall Goodwin bringing discounting and waiving copays and deductibles to his attention as illegal.  (Barrett Dep. at 55).  He did recall discovering that one doctor, Dr. Earle, was receiving special pricing, and instructed Goodwin to stop it.  Barrett later learned that she had restarted the practice in order to "pacify" Dr. Earle.  (*Id.* at 58–61).

government, in the case of Medicare and Medicaid.  This account predated Columbia/HCA's takeover of Gramercy.  Goodwin testified that she discovered an error in the previous business operations manager's treatment of insurance overpayments.[5]  To remedy the error, Goodwin created insurance overpayment accounts and transferred the funds to Columbia/HCA Corporate on a quarterly basis, pending refund requests or reclassification as income.[6]  Funds began accumulating in the Gramercy overpayment account because Gramercy had no authority to issue refund checks to the insurers or the government.  In November 1994, Goodwin asked chief financial officer Benny McDonald how Columbia/HCA intended to handle the insurance overpayment refunds.  Goodwin states that she received no instructions on how to proceed.  In her affidavit, Goodwin noted that the Gramercy overpayment account raised two issues relating to federal funds:  whether federal payors were properly refunded any overpayments and whether excess funds would be classified as income for tax purposes.  In September 1996, Columbia/HCA Regional Chief Financial Officer Pam Ashworth contacted Goodwin about the accrued amount in the account.  According to Goodwin, "I had discussed the account with Corporate's accountants

---

[5]     According to Goodwin, "[W]hen I came to Columbia insurance overpayments were being hidden in patient accounts.  The practice I discovered worked to zero out credit balances caused by insurance overpayments without refunding the money.  The previous BOM had performed a charge adjustment to zero out the balances.  I felt this was improperly hiding refunds due to insurers." (Docket Entry No. 66, (Goodwin Aff.) ¶ 11).

[6]     Goodwin's affidavit states, "Prior to this time I had no way of knowing whether the appropriate refunds had been made, as the funds were transferred to Corporate's accounting.  However, in previous years, at the end of the year, any excess funds would be transferred back to the Center and accounted for as income for federal income taxes purposes.  I was concerned in September 1996 because over $200,000 had been transferred to Corporate by year end 1995, and none of that money was accounted for as our income." (*Id.,* ¶ 12).

on numerous occasions when going over monthly reports.  I told Ms. Ashworth of this, but she became upset and stated she would get back to me with instructions on how to proceed. Ms. Ashworth never provided those instructions."  (*Id.* ¶ 11–12).

Later in September 1996, Goodwin attended a clinic administrators' meeting in place of her supervisor, Barrett.  She described an exchange about the overpayment account that occurred at that meeting:

> I took advantage of the opportunity to bring up the insurance overpayment account to Ms. Ms. [sic] Ashworth in front of other Administrators, by asking her where the $200,000 in overpayment money from 1995 had gone.  Ms. Ashworth became visibly upset, and the other Administrators acted shocked that I had raised it.  Ms. Ashworth claimed to be unaware of the practice, and stated the centers were to begin returning overpayments to insurers immediately.  She did not address what to do about all of the funds that had previously been transferred to Corporate accounts.  I never received any instructions on how to account for this money, and to my knowledge, it was never reported as income to the center.  To protect myself, I asked that the change in policy be put in writing, but it never was.

(*Id.*, ¶ 13).

Goodwin testified that by November 1996, she and Barrett had implemented a price reduction on many procedures in order to stem doctors' demands for discounts and special pricing.  By mid-December, Barrett had been fired.  He was replaced as administrator of Gramercy by Carol Simons, who had previously served as administrator at the Travis clinic. (*Id.*, ¶ 16).  After Barrett was fired, Simons served as administrator for both the Travis and Gramercy surgical clinics.  In early January 1997, Simons fired Goodwin.

Goodwin described the series of events that led to her own firing in her affidavit, deposition, and in a contemporaneous diary.  Many of the facts are undisputed.  Simons came

to Goodwin's office after the clinic closed on December 31, 1996, to discuss end-of-year reports.  Goodwin told Simons that her responsibilities included the preparation of some reports, but not others, which had been previously completed by the administrator.  Simons responded that Goodwin was responsible for all the year-end reports, not just the ones she had previously completed.  Goodwin and Simons argued over who would be responsible for preparing which reports.  Both became angry.  According to Goodwin, Simons assigned her the task of completing all the year-end reports by January 3, 1997.  Because January 1 was a holiday, Goodwin had one working day to prepare the reports.  Goodwin objected to the assignment, stating that she did not know how to prepare some of the reports, that the reports had previously been the administrator's responsibility, and that "if the reports were to become my job responsibility, I wanted them added to my job description."  Simons told Goodwin that she had to complete the reports or she would lose her job.  "I responded, 'Carol, I have no intention of being set up to fail as was done to Scott, nor will I allow you to dump your responsibilities on me as you have done to [Travis business operations manager] Starla [Shinn]."  (*Id.* ¶ 16–17).  Because the conversation had become a "shouting match," Goodwin "advised Ms. Simons that I felt it was in my best interest to set up a conference with [Simons's superiors] Becky Lee and if necessary, Steve Royal."  (Docket Entry No. 66, ex. 7 (Goodwin Diary) to att. 4 (Goodwin Dep.)).

Goodwin and Simons continued their argument when Gramercy reopened the morning of January 2, 1997.  According to Goodwin, Simons insisted that Goodwin complete the year-end reports and repeatedly demanded a "yes or no" answer.  "At this time, I told Ms.

Simmons [sic] I wanted a witness in the office." (*Id.*).  As Gramercy's Clinical Director,

Elaine Hand, looked on, Simons terminated Goodwin's employment effective immediately

and demanded that Goodwin leave the premises.

This description of the events is corroborated by Clinical Director Elaine Hand, the

"witness" summoned to the confrontation:

> Marie [Goodwin] then said she would only do the report if it were added to her
> job description and if she could sign it and take credit for it. . . . Marie
> demanded that it be added to her job description and then she would consider
> it.  Carol [Simons] then told Marie that her job at Gramercy was terminated
> immediately and to gather her personal belongings and leave the premises. . . .
> Marie also voiced several other personal attacks on Carol Simons.  She was
> very angry and loud during the entire conversation.  We closed the door to her
> office to keep the other employees from being subjected to her behavior and
> conversation.

(Docket Entry No. 55, ex. 4 to att. K (Hand Dep.)).

Goodwin's diary entry for February 1997 states that she sought an attorney to discuss

her wrongful discharge.  Goodwin states that she was refused unemployment benefits

because she was dismissed for alleged insubordination and poor job performance.  (*Id.*).

### B.    Procedural Background

Goodwin asserts that she and Barrett filed a *qui tam* action in 1997, (Docket Entry

No. 66, p. 1), and that each asserted a retaliation claim under the whistleblower provision of

the False Claims Act, 31 U.S.C. § 3730 (2005).  In 1998, Goodwin sued Gramercy and

Columbia/HCA in Texas state court, asserting a cause of action for common-law wrongful

termination on the basis that she had been fired for refusing to perform illegal acts.  (Docket

Entry No. 55, att. D).  Goodwin nonsuited that action in 1999.  According to Columbia/HCA,

she then joined Barrett's *qui tam* suit as a co-relator.  (Docket Entry No. 55, p. 4).  In 1999, the Multi-District Litigation panel transferred the case to Washington, D.C., where other *qui tam* cases were pending against Columbia/HCA.  Columbia/HCA moved to dismiss the complaint for failure to state a claim.  On March 15, 2001, the United States declined to intervene.  Columbia/HCA settled other *qui tam* cases involving inpatient hospitals, but Gramercy, as an outpatient surgery center, did not fall within the group of settled cases.  On February 24, 2003, the federal District Court for the District of Columbia granted Columbia/HCA's motion to dismiss Barrett and Goodwin's *qui tam* claims for failure to state a claim with the necessary particularity.  The court denied Columbia/HCA's motion to dismiss the retaliation claims  under the False Claims Act, stating that the allegations might state a basis for relief if repleaded with particularly.  The court granted Barrett and Goodwin leave to amend their pleadings.  According to Goodwin's summary judgment response, "[t]hese allegations remain in Relator's Third Amended Complaint, but relators declined to amend their complaint."  (Docket Entry No. 66, p. 3).  The transferee court remanded the case to the Southern District of Texas, with only the unamended retaliation claims remaining. Barrett settled his claims in September 2004, leaving Goodwin's retaliation and state-law claims.  (Docket Entry No. 54).  Defendants seek summary judgment as to all Goodwin's remaining claims.

## II.      The Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  *See* FED. R. CIV. P. 56.  Under FED. R. CIV. P. 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*,  477 U.S. 317, 322 (1986); *Stahl v. Novartis Pharmaceuticals Corp.*, 283 F.3d 254, 263 (5th Cir. 2002).  If the burden of proof at trial lies with the nonmoving party, the movant may either (1) submit evidentiary documents that negate the existence of some material element of the opponent's claim or defense, or (2) if the crucial issue is one on which the opponent will bear the ultimate burden of proof at trial, demonstrate the evidence in the record insufficiently supports an essential element or claim.  *Celotex*, 477 U.S. at 330.  The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the nonmovant's case.  *Bourdeaux v. Swift Transp. Co., Inc.,* 402 F.3d 536, 540 (5th Cir. 2005). "An issue is material if its resolution could affect the outcome of the action." *Weeks Marine, Inc. v. Fireman's Fund Ins. Co.*, 340 F.3d 233, 235 (5th Cir. 2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).  If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response.  *Baton Rouge Oil & Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).

When the moving party has met its Rule 56(c) burden, the nonmoving cannot survive

a motion for summary judgment by resting on the mere allegations of its pleadings.  The nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim.  *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force,* 379 F.3d 293, 305 (5th Cir. 2004).  The nonmovant must do more than show that there is some metaphysical doubt as to the material facts.  *Armstrong v. Am. Home Shield Corp.,* 333 F.3d 566, 568 (5th Cir. 2003).

Affidavits supporting or opposing summary judgment must "set forth facts that would be admissible in evidence." FED. R. CIV. P. 56 (e); *see Love v. Nat'l Med. Ctr.*, 230 F.3d 765, 776 (5th Cir. 2000).  "Statements constituting hearsay are not competent summary judgment evidence." *Okoye v. Univ. of Tex. Houston Health Science Ctr.*, 245 F.3d 507, 510 (5th Cir. 2001) (citing *Fowler v. Smith*, 68 F.3d 124, 126 (5th Cir. 1995)).  Material that is inadmissible will not be considered on a motion for summary judgment because it would not establish a genuine issue of material fact if offered at trial.  *See Pegram v. Honeywell, Inc.,* 361 F.3d 272, 285 (5th Cir. 2004).

In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party.  *Calbillo v. Cavender Oldsmobile, Inc.*, 288 F.3d 721, 725 (5th Cir. 2002); *Anderson*, 477 U.S. at 255.  "Rule 56 '*mandates* the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (*quoting Celotex*, 477 U.S. at 322).

III.    **Analysis**

A.      **What This Court May Consider**

To support their summary judgment motion, defendants submitted the opinion and orders issued by the transferee court in the District of Columbia;  excerpts from Goodwin's deposition and original state court filings; Simons's affidavit; two internal Columbia/HCA memoranda; excerpts from Kirk Tenkhoff's deposition; excerpts from Elaine Hand's deposition; and Goodwin's job description.  Evidence submitted with Goodwin's summary judgment response includes: affidavits by Goodwin and Barrett and excerpts from their depositions; excerpts from the depositions of Kirk Tenkhoff, Elaine Hand, Rebecca Lee, and Jeannine Georgiou-Broyles; and an affidavit by an attorney, R. Terry Heath, submitted under Rule 702, on the reasonableness of the opinions Barrett and Goodwin formed about the legality of Gramercy's practices.[7]   Goodwin also submitted a supplemental summary judgment response and attached the depositions of Carla Holden and Pam Ashworth and several hundred pages of medical and financial records from the Gramercy clinic.

---

[7]       Defendants have moved to exclude Heath's expert report and testimony as unreliable under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 570 (1993).  (Docket Entry No. 57).  Heath opined as to the "reasonableness of certain thoughts by Mr. Barrett and Ms. Goodwin" in relation to "certain actions they were taking."  (*Id.*, att. B (Heath Dep.) at 26).  According to Goodwin, Heath would provide expert testimony as to whether co-relators' "specific beliefs and actions" in 1996–1997 "relating to certain activities of defendants were reasonable in light of" Texas and federal statutory law, and whether co-relators "would have been subject to criminal prosecution had they undertaken certain activities."  (Docket Entry No. 65). Goodwin cites Heath's testimony in her supplemental summary judgment response to show that "Goodwin refused to commit illegal acts that violated the False Claims Act" and "refused to commit illegal acts that did not fall within the purview of the FCA, but nonetheless were illegal acts that carried a criminal penalty under Texas Law."  (Docket Entry No. 83 at 1–2).  This court ultimately finds defendants are entitled to summary judgment on all claims without regard to the reasonableness of co-relators' subjective beliefs and actions; defendant's motion to exclude is denied as moot.

Defendants have objected to several portions of Barrett's and Goodwin's affidavits on the grounds that they contradict deposition testimony and that the affiants lack personal knowledge for the conclusions they state.  (Docket Entry No. 73).  *See Copeland v. Wasserstein, Perella & Co., Inc.*, 278 F.3d 472, 482 (5th Cir. 2002) (stating that "under the federal rules, when the sole evidence purporting to create a genuine issue of material fact and thus to preclude summary judgment is an affidavit that conflicts with deposition testimony, we have required an explanation of that conflict.").  Defendants complain that in Goodwin's affidavit, she stated that she created three overpayment accounts for private insurance and Medicare overpayments, while in her deposition, she testified that she created two such accounts.  Defendants also object that in Goodwin's affidavit, she stated that she raised the issue of overpayments at a September 1996 administrators' meeting, but in her deposition, she did not recall how the issue arose.  In her diary, Goodwin stated simply that the issue "came up."  (Docket Entry No. 66, ex. 7 to Goodwin Dep., at 4).  Defendants do not explain how these inconsistencies are so material and inconsistent as to require an explanation or the omission of the affidavit from the summary judgment evidence.  *See Copeland*, 278 F.3d at 482.

Examination of these three instances of purported conflict between the Goodwin affidavit and deposition does not show a basis for striking the affidavit.  With respect to the issue of the discussion of insurance overpayments at the September 1996 meeting, the relevant testimony is that regardless of how the issue was raised, Goodwin asked Ashworth what happened to the 1995 overpayments.  In her deposition, Ashworth recalled little, if

anything about this meeting.[8]  Defendants object that paragraph seven of Goodwin's affidavit

contradicts pages 154 through 158 of her deposition, but neither party has submitted pages

154 through 157 for this court's review.  The cited portion of paragraph seven states that

Barrett "was attempting to get some action taken by Columbia to stop the practices, and kept

me informed."  Defendants object on the basis of lack of personal knowledge.  On the

available deposition page cited by defendants, Goodwin testified that she knew that Barrett

had raised "illegal practices"[9] with his supervisors because of her participation in the

Tenkhoff/Beasley conference call, a sufficient showing of personal knowledge to overcome

the objection.  Defendants also point out minor inconsistencies in Goodwin's recollection of

how she created or incorporated portions of her diary of events.  These minor inconsistencies

are generally explained in Goodwin's deposition and do not require this court to disregard

these aspects of Goodwin's summary judgment evidence.

Defendants also object to other parts of Goodwin's affidavit as cumulative,

conclusory, and lacking in personal knowledge.  In Goodwin's affidavit, she stated that she

---

[8]      Ashworth testified in a 2005 deposition that she did not recall having any conversation with
Goodwin in 1996 about insurance overpayments, but remembered attending a "group meeting" in Houston
at some date.  Ashworth did not remember if Goodwin attended, nor if Goodwin ever brought up any issue
regarding overpayments.  Asked if she remembered Goodwin raising any issues whatsoever during this
meeting, Ashworth answered, "No.  I don't recall her even being there specifically it was so long ago."
(Docket Entry No. 83, att. 18, pp. 17–21).

[9]      Goodwin listed eight "illegal practices" in her diary.  She testified in her deposition that
Barrett spoke with her about five of them: (1) copay and deductible waivers; (2) providing in-network
discounts to out of network patients; (3) Dr. Stewart's free cases; (4) charging different fees to Dr. Earle's
patients; and (5) altering procedure codes to boost Medicare recovery.  Barrett did not speak to her about the
shared HEA employee, the shared security guard, or the equipment leases.  (Docket Entry No. 55, att. B,
(Goodwin Dep.) at 158).

"voiced [my] disapproval of these practices, stating [I] felt the special pricing and medicare practices might be illegal."  Defendants object to this statement and to Goodwin's statement that she was told at a May 1996 meeting of administrators of Columbia/HCA facilities to be careful about waiving copays and deductibles but to "keep doctors happy."[10]  Defendants object that Goodwin does not identify to whom she voiced her disapproval, or who told her to "keep doctors happy."  Defendants fully explored these gaps at Goodwin's deposition.  To the extent Goodwin provided additional, consistent factual details about these events in her deposition testimony, this court considers that testimony in analyzing the summary judgment motion.  These objections go to the weight of the testimony, not the admissibility, and are overruled.

Defendants object to several portions of Barrett's affidavit on similar grounds. Defendants complain that Barrett used "the present tense" to describe Gramercy's ownership structure, of which he lacks personal knowledge.  Defendants do not identify changes to Gramercy's ownership since December 1996 or January 1997, or state what the relevance of any changes might be.  Defendants also object to the fact that Barrett's affidavit provided a list of potentially illegal practices that he discussed with Goodwin, but in his deposition he recalled discussing only "discounting" and "Dr. Stewart's free case."  (Barrett Dep. at 98). Barrett's affidavit stated:

I remember talking to her about the free cases being performed by Dr. Stewart,

---

[10]        Barrett testified that he memorialized a conversation where Beasley told him, "Greg Roth went over this and we need to be careful how we waive copays and deductibles, but we still need to ultimately retain our cases."  (Docket Entry No. 66, att. 5 (Barrett Dep.), at 127).

preferential discounting of surgery pricing for physicians; inconsistent pricing for services determined by the responsible insurance company, including Medicare; and waivers of co-pays and deductibles based on demands by physicians. . . . In particular Marie was concerned about practices involving Medicare patients.  She was also concerned about the free procedures being given to Dr. Stewart, the special pricing being given to physicians who were partial owners, including Dr. Earle.  She also had a problem with Dr. McWilliams improperly coding procedures to obtain Medicare and Prucare coverage.

(Docket Entry No. 66, (Barrett Aff.) ¶ 3).  In Barrett's deposition, he testified that in January 1996, he and Goodwin discussed one doctor's practice (Dr. Earle) of pricing procedures differently depending on the patient and payor.[11]  Barrett testified that after March 1996, he also discussed Dr. Earle's equipment lease arrangement with Goodwin.  (Barrett Dep. at 70–71).  Barrett testified that he discussed Dr. Stewart's "free case" with Goodwin.  (Barrett Dep. at 78).  Barrett also testified that Goodwin knew of the "special" and inconsistent pricing because Goodwin "kept that information."  As far as whether Goodwin and Barrett discussed the legality of these practices, Barrett testified as follows:

> Q:      At any point in time, let's say during the first six months you were the administrator at Gramercy, did Marie Goodwin ever come to you and discuss practices that she believed were unethical or illegal?
>
> A:      The issue of the dual fee schedule or, you know, waiver of copays and things like that I would recall to be around that time.

(Barrett Dep. at 55).  Barrett testified, "I don't recall if she, you know, directly came out and said, here's some issues that have to be looked at or if it was like, 'Hey, we've got a problem

---

[11]      Barrett instructed Goodwin to stop the practice of charging different prices for the same procedure.  In August 1996, Barrett discovered that Goodwin had returned to providing different pricing for Dr. Earle's patients and wanted to know why.  Barrett testified that Goodwin replied that Dr. Earle insisted on receiving special prices.  Barrett's notes stated that Dr. Earle was "raising hell about it."  (Docket Entry No. 66, att. 5 (Barrett Dep.) at 60–61).

do you mind looking at this?' I don't really recall the temperament of what the conversation was." (*Id.*).  Later in his deposition, Barrett clarified which practices Goodwin and he had talked about as "illegal or unethical" practices:

> Q:    Did Mrs. Goodwin ever tell you, during the time y'all worked together at Gramercy, that she thought any particular practice or procedure was illegal or unethical?
>
> A:    The discounting.
>
> Q:    Okay.  Other than the discounting?
>
> A:    And Dr. Stewart's free case.
>
> Q:    Anything else?
>
> A:    No.  That's pretty much the only focus that would have been in the business office that she would have had any knowledge of.
>
> Q:    Okay.  So of these issues that you felt, over time, were illegal or unethical, the only ones that you ever had discussions about with Marie would have been the free case for Dr. Stewart and the issue of discounting?
>
> A:    I would assume so, yes.

(Barrett Dep. at 98).  Defendants' motion to strike this portion of Barrett's affidavit is denied; the inconsistency defendants assert does not rise to the level that justifies striking the affidavit.

Defendants also assert that Barrett's affidavit statement that he raised concerns with superiors at the May 1996 Dallas meeting is inconsistent with his earlier deposition testimony.  The portions of  Barrett's deposition cited were not submitted with defendants' motion to strike or for summary judgment.  The available portions of Barrett's deposition do

not demonstrate  such an inconsistency with the affidavit as to require this court to disregard the affidavit.  Defendants' motion to strike is denied.

### B.      The False Claims Act Retaliation Claim

The False Claims Act, 31 U.S.C. § 3729 *et seq*., generally prohibits making false or fraudulent claims for payment of government funds or benefits.  *See United States v. Hess*, 317 U.S. 537, 551, 63 S. Ct. 379, 87 L. Ed. 443 (1943) (stating that the purpose of the False Claims Act is "to provide for restitution to the government of money taken from it by fraud").[12]  The FCA permits individuals with knowledge of fraud against the government to

---

[12]      Liability under the False Claims Act occurs when a person or entity:

(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;

(3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid; or

(7) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government.

31 U.S.C. § 3729(a).

The term "knowingly" has a special meaning within the context of the False Claims Act: "knowing" and "knowingly" mean that a person, with respect to information—

(1) has actual knowledge of the information;
(2) acts in deliberate ignorance of the truth or falsity of the information; or

(3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

initiate *qui tam* actions against an entity suspected of committing the fraud.  The FCA also

prohibits retaliation against employees for their lawful acts "in furtherance of an action under

this section."  Section 3730(h) states:

> Any employee who is discharged, demoted, suspended, threatened, harassed,
> or in any other manner discriminated against in the terms and conditions of
> employment by his or her employer because of lawful acts done by the
> employee on behalf of the employee or others in furtherance of an action under
> this section, including investigation for, initiation of, testimony for, or
> assistance in an action filed or to be filed under this section, shall be entitled
> to all relief necessary to make the employee whole.  Such relief shall include
> reinstatement with the same seniority status such employee would have had
> but for the discrimination, 2 times the amount of back pay, interest on the back
> pay, and compensation for any special damages sustained as a result of the
> discrimination, including litigation costs and reasonable attorneys' fees.  An
> employee may bring an action in the appropriate district court of the United
> States for the relief provided in this subsection.

31 U.S.C. § 3730(h) (2005).   "The purpose of the False Claims Act, of course, is to

discourage fraud against the government, and the whistleblower provision is intended to

encourage those with knowledge of fraud to come forward."  *Robertson v. Bell Helicopter*

*Textron,* Inc., 32 F3d 948, 951 (5th Cir. 1994).  In *Hutchins v. Wilentz*, 253 F.3d 176 (3d Cir.

2001), the court reviewed a district court's grant of summary judgment against a

whistleblower's retaliation claim:[13]

> A plaintiff asserting a cause of action under § 3730(h) must show (1) he
> engaged in "protected conduct," (i.e., acts done in furtherance of an action

---

31 U.S.C. § 3729(b).

[13]     The *prima facie* elements of a retaliation claim under the False Claims Act are that:  (1) the
employee engaged in protected activity under the statute; (2) the employer knew that the employee engaged
in protected activity; and (3) the employer discriminated against the employee because she engaged in
protected activity.  31 U.S.C. § 3730(h); *United States ex rel Graves v. ITT Educ. Servs., Inc.*, 284 F. Supp.
2d 487, 510 (S.D. Tex. 2003), *aff'd*, 111 Fed. Appx. 296 (5th Cir. 2004).

under § 3730) and (2) that he was discriminated against because of his "protected conduct." *United States ex rel. Yesudian v. Howard Univ.*, 332 U.S. App. D.C. 56, 153 F.3d 731, 736 (D.C. Cir. 1998) (*quoting* S. Rep. No. 99-345, at 35 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5300). In proving that he was discriminated against "because of" conduct in furtherance of a False Claims Act suit, a plaintiff must show that (1) his employer had knowledge he was engaged in "protected conduct"; and (2) that his employer's retaliation was motivated, at least in part, by the employee's engaging in "protected conduct." *Id.*; *see also Zahodnick v. Int'l Bus. Machines Corp.*, 135 F.3d 911, 914 (4th Cir. 1997). At that point, the burden shifts to the employer to prove the employee would have been terminated even if he had not engaged in the protected conduct. *Mikes v. Strauss*, 889 F. Supp. 746, 754 (S.D.N.Y. 1995).

253 F.3d at 186. The parties dispute whether the summary judgment evidence raises a disputed fact issue as to all the elements of a retaliation claim. The record as to each of those elements is examined below.

### 1.    *Protected Activity*

Defendants argue that the record reveals that Goodwin did not engage in protected activity. Because the FCA's antiretaliation provision protects those who act "in furtherance" of a FCA claim, filing a successful *qui tam* action is not a requirement of seeking redress under section 3730. *United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 236 (1st Cir. 2004); *Yesudian*, 153 F.3d at 741. Nor does a retaliation plaintiff need to report fraud allegations to government officials; internal or intracorporate reporting of fraudulent activity will suffice. *See Hopkins v. Actions, Inc. of Brazoria County*, 985 F. Supp. 706, 709 (S.D. Tex. 1997) ("[T]he FCA forbids discrimination or retaliation against an employee who has made an intra-corporate complaint about fraud against the government, so long as that employee intends to file such an action and informs management clearly of that intention").

The content of a plaintiff's intracorporate reporting is important.  In *Robertson*, the plaintiff, a contract administrator for a defense contractor, asserted that he had been retaliated against for refusing to request additional government funds for cost overruns unless his employer substantiated the increased costs.  32 F.3d at 949.  The activities asserted as protected by the FCA were "expressions[s] of concerns to his superiors" and "investigation of increased costs."  The Fifth Circuit "conclude[d] that this did not constitute protected activity under the False Claims Act."  *Id.*  The court distinguished other intracorporate reporting cases in which plaintiffs "express[ed] concerns about possible fraud to their employers."  In contrast to the employees' communications in those cases, "Robertson admitted that he never used the terms "illegal," "unlawful," or "*qui tam* action" in characterizing his concerns."  *Id.* at 951.

In addition, the protected conduct element requires that a whistleblower must report or investigate attempts to defraud the government.  *See Barrett*, 251 F. Supp. 2d at 37–38.  "All that is required is that an employee be investigating false or fraudulent claims aimed at extracting money from the government.  'The employee must, at least to some degree, couch her concerns or investigation in terms of funds her employer fraudulently obtained from the government.'"  *Id.* (*quoting Luckey v. Baxter Healthcare Corp.*, 2 F. Supp. 2d 1034, 1055 (N.D. Ill. 1998)); *Hopper*, 91 F.3d at 1269 (accord); *Hammack v. Automated Info. Mgmt.*, *Inc.*, 981 F. Supp. 993, 996 (N.D. Tex. 1997) (accord).

Defendants move for summary judgment on the basis that Goodwin did not complain about potential fraud or illegality aimed at obtaining government funds.  Goodwin argues that

this element is satisfied by the evidence as to her 1996 discussion with Columbia/HCA

Regional Vice-President Greg Beasley during and after he visited Gramercy's office in late

May 1996.  Goodwin testified that she and Beasley met in her office, and she told him that

various Gramercy practices — including "[o]verpayments, copays, pricing, Medicare, free

cases" — were illegal:

> Q:     Those are the items that Mr. Beasley asked or told you to do [that were
>        illegal or unethical]?
>
> A:     Told me in a sense that when he was approached by myself telling him
>        that these were things we were doing and I now found out that they
>        were illegal and I was not going to take part in it anymore and I was not
>        going to be the fall guy for Columbia, his statement was just, you
>        know, "Let me get back with you on it."

(Docket Entry No. 55, Goodwin Dep. at 103).[14]  Later in her deposition, Goodwin was asked

specifically what illegal activities she raised with Beasley:

> Q:     What specifically did you talk to him about that day?
>
> A:     I don't recall specifically.  I definitely recall the item that was brought
>        up at the [Dallas] meeting on these copays and deductibles.
>
> Q:     That's the only thing specifically —
>
> A:     That I recall.
>
> Q:     You recall discussing with [Beasley], correct?
>
> A:     Uh huh.

---

[14]     Goodwin initially could not recall the exact date of this conversation, but remembered that it occurred in her office and that only Beasley was present.  The conversation occurred in 1996, according to Goodwin, because Barrett still worked at Gramercy at the time.  (Goodwin Dep. at 104).  Later in her deposition, Goodwin confirmed that this conversation took place on May 31, 1996 by referring to her diary of events.  (*Id.* at 234).

Q:    What did you discuss with him on May 31?

A:    I just told you.

Q:    Is it what you say here, "I personally discussed with him my unwillingness to continue with these illegal practices and stated I will not be the fall guy for Columbia if we get caught"?

A:    Yes.

Q:    And you have that in quotes here.  So, is that — you're fairly certain those were your exact words?

A:    Those were my exact words.

(Goodwin Dep. at 233–34).

On the same day that this conversation occurred, Beasley conducted a conference call with Goodwin, Columbia/HCA Regional Compliance Director Tenkhoff, and Barrett.  (*Id.* at 234).  Goodwin testified in her deposition that the conference call participants discussed "illegal practices" including "[p]ricing and the problems we were having with the doctors' demands . . . [c]opays, Medicare, writing off.  That's all I remember."  (*Id.* at 236).  Barrett stated in his affidavit that Beasley and Tenkhoff were aware of illegal pricing and Medicare practices because of their participation in this conference call.  (Docket Entry No. 66, att. 2 (Barrett Aff.), ¶ 6).  Barrett did not recall these details in his deposition:

Q:    What do you recall about the conversation, other than what's reflected in your notes?

A:    I mean, that's— gonna be my only recollection of the call.

(Barrett Dep. at 133).[15]  Barrett's notes from the conference call state, "Items discussed. Discounting and not collecting copays and deductibles.  It seems if we offer everyone a discount, it's okay.  But Kirk wants to consult CFOs and counsel.  Kirk will get back to us with the results as soon as possible.  Until then, we are to continue doing business as usual until we get a directive from corporate per Greg Beasley."  (Barrett Dep. at 133, describing ex. 25 to deposition).  Asked if he could recall anything else discussed in the conference call, Barrett responded, "Not that I can recall."  (Barrett Dep. at 135).  Barrett testified that by the time Holden replaced Beasley as Barrett's supervisor in September 1996, these issues were unresolved.  (*Id.* at 137–38).

Defendants respond that Beasley addressed Goodwin's concerns by initiating the conference call.  In Tenkhoff's deposition, he testified that during the call, the participants discussed discounting prices for procedures.  Tenkoff testified that he instructed them that discounting prices was improper.  (Docket Entry No. 55, p. 10; *id.* att. J (Tenkhoff dep.)). The argument as to the response to the issue of possible fraudulent or illegal practices does not address whether Goodwin made an intracorporate report of possible fraud or illegality. Although little Fifth Circuit case law exists on this issue, in *Robertson*, the court found that the plaintiff had not engaged in protected activity, emphasizing that he "never used the terms 'illegal,' 'unlawful,' or '*qui tam* action' in characterizing his concerns about" his employer's charges to the government.  32 F.3d at 951.  The *Robertson* court repeatedly stressed that the

---

[15]        In his deposition, Barrett recalled that Beasley "probably" set up the conference call, but he did not know for sure.  (*Id.*, att. 5 (Barrett Dep.) at 131–32).

FCA aims at those who are "defrauding the government" and that the purpose of the Act is to "discourage fraud against the government."  *Id.*

Goodwin testified that the May 1996 conference call occurred after she reported potentially illegal practices to Beasley.  Goodwin's and Barrett's affidavits stated that the May 1996 conference call participants discussed the "potential illegality" of discounting procedures and waiving copays and deductibles, "particularly with Medicare" and "illegal discounting."  (Goodwin Aff., ¶ 9; Barrett Aff., ¶ 6).  Co-relator Barrett's deposition and contemporaneous notes do not mention any discussion of illegal activity or Medicare fraud, but do mention discounting and waiving copays and deductibles.  The record raises a genuine issue of material fact as to whether Goodwin made an intracorporate report of government fraud to Beasley, Tenkhoff, and Barrett that meets the requirements for protected activity under the FCA.

Goodwin also asserts that she met the protected activity requirement by evidence that she brought the insurance overpayments account to the attention of Columbia/HCA management.  In his deposition, Barrett recalled that Goodwin had discussed the issue of the insurance overpayments account, but not that Goodwin ever reported or characterized it as involving fraud or illegality:

> Q:   Did it ever come to your attention, while you were at Gramercy, that there was a procedure in place whereby overpayments from insurance companies were transferred to an overpayment account?  You may have heard some testimony about that in Mrs. Goodwin's deposition.
>
> A:   Yes.
>
> Q:   Were you aware that the practice was going on when you were the

administrator?

A:    Marie brought it to my attention that it was an issue when she was working with the folks in Dallas about it.

Q:    Did she indicate to you when she — at any time, that she thought that it was some sort of an illegal or unethical practice?

A:    I don't specifically recall if she said that it was illegal.  I believe her stance was this is the insurance company's money and we need to get it back to them.

(Docket Entry No. 66, att. 5 (Barrett Dep.) at 257).

Goodwin also alleges she reported potential illegalities involving the insurance overpayment account to Columbia/HCA Regional CFO Pam Ashworth in September 1996. Ashworth had telephoned Goodwin about an accrued accounts receivable balance for insurance overpayments.  Goodwin testified that she explained to Ashworth that Gramercy transferred insurance overpayments to this corporate account at the end of each month. Goodwin described Ashworth as "most upset" to learn of this account, but "I can't tell you the reason for her being upset."  (Docket Entry No. 66, att. 4, ex. 7 to Goodwin Dep. at 3; Goodwin Dep. at 241).  Later that month, Goodwin attended an administrators' meeting in Barrett's place.  According to Goodwin's diary, when the insurance overpayment issue arose, Goodwin asked — "much to the horror of all present" — "where the overpayment money was going."  Ashworth told the meeting attendees that they were to return all such overpayments to the insurance companies rather than transferring them to an overpayment account.  Although Goodwin thought the money should be returned to the insurance companies, she "had a problem" with this verbal request.  "I wanted it in writing, and so did

the rest of the managers." (Goodwin Dep. at 242–43).

> Q:    Why did you want it in writing?
>
> A:    Wouldn't you?
>
> Q:    Why did you want it in writing?
>
> A:    I wanted it in writing. I told you I'm a documenter. I wanted to see it in writing.

(*Id.* at 243).  Despite Ashworth's verbal directive, Goodwin did not begin returning the insurance overpayments.  She explained her inaction as consistent with her belief that "[b]usiness was conducted as usual until policy, written policy, came down." (*Id.* at 244).

Defendants respond that none of Goodwin's testimony regarding this incident concerns fraud involving Medicare or other government funds, and that Ashworth directed those attending the administrators' meeting in compliance with the law. (Docket Entry No. 55, p. 10).  Goodwin's testimony demonstrates that she did not report suspected illegal or fraudulent activities to Ashworth during this telephone call or in the administrators' meeting. This incident does not raise a genuine issue of material fact as to whether Goodwin made an intracorporate report of fraud against the government that would satisfy the element of engaging in protected activity.  *See Robertson*, 32 F.3d at 951 (simply expressing "concerns" is not protected activity under section 3730); *Barrett*, 251 F. Supp. 2d at 38 (employee report or investigation must concern funds an employer fraudulently obtains from government).  The testimony from Barrett and Goodwin concerning their conference call with Beasley and Tenkhoff, however, raises a genuine issue of material fact sufficient to satisfy this element of a retaliation claim.

2.      *The Employer's Knowledge of Protected Activity*

Defendants claim that even if Goodwin engaged in protected conduct, the record reveals no factual issue as to whether the necessary representatives of her employer knew of her protected activity, her intracorporate reporting.   "[A] whistleblower must show the employer had knowledge the employee engaged in protected activity."  *Robertson*, 32 F.3d at 951 (internal quotations and citations omitted).

Defendants argue that the relevant "employer" with knowledge of a whistleblower's protected activity must be the decisionmaker who terminated the whistleblower's employment.  According to defendants, Goodwin must produce summary judgment evidence that Simons knew of Goodwin's reports and complaints of illegal activities affecting Medicare payments in order to show the requisite knowledge by the employer.  In her affidavit, Goodwin stated that she "raised the issue if [sic] illegal practices at several administrators meetings attended by Becky Lee, and Carol Simons."  (*Id.*, ¶ 19).  This affidavit testimony contains no specifics about when, where, or what Goodwin allegedly told Lee or Simons.  Goodwin's deposition testimony makes it clear that she did not at any time mention any potential illegality directly to Simons:

> Q:     Did you ever go to Ms. Simons during that two weeks [prior to being fired] and show her any documents or attempt to show her any documents that you believed evidenced illegal activities?
>
> A:     In the two weeks that Ms. Simons was there—
>
> Q:     Yes, ma'am.
>
> A:     — I did not approach her.  I did not give her anything.  I did not discuss with her the illegal practices in that two-week time.  The answer, my

final answer is no.

Q:     And you had never discussed with her any type of these illegal practices prior to the two weeks that you worked for her, had you?

A:     I would not have any reason to discuss with Ms. Simons.

(Goodwin Dep. at 308–09).

The case law interpreting the FCA does not support the narrow interpretation of the employer's knowledge of the protected activity that defendants urge. *See Robertson*, 32 F.3d at 951 ("whistleblower must show the employer had knowledge"); *id.* at 952 ("Robertson failed to present sufficient evidence to support a finding that Bell [Helicopter Textron, Inc.] was aware that his investigations were in furtherance of a *qui tam* action"); *Yesudian*, 153 F.3d at 742 ("[T]he kind of knowledge the defendant must have mirrors the kind of activity in which the plaintiff must be engaged.").  Defendants' interpretation conflates aspects of two separate elements of a retaliation claim: the second element that the employer must know of the protected activity with the third element that the employer fired or otherwise discriminated against the employee because she engaged in the protected activity.

Defendants do not appear to dispute that Goodwin told Barrett, her supervisor and the Gramercy administrator, of her concerns about Gramercy's pricing and insurance practices:

> Shortly after I became the Administrator at Gramercy, Marie Goodwin and I conferred with each other about the illegality of some of the practices engaged in by the center. . . .  In particular, Marie was concerned about practices involving Medicare patients. . . . I advised Goodwin that these practices were potentially illegal, and began investigating the specifics, while inquiring through appropriate channels to stop these practices.

(Docket Entry No. 66, Barrett Aff., ¶ 3).  Goodwin's affidavit testimony is in accord,

although she stated that she — not Barrett — was the one who raised the issue of potential illegality. (Goodwin Aff., ¶ 6). In addition, Goodwin asserts that Gramercy had the requisite knowledge as a result of her conversation with Beasley about her concerns over Gramercy's discounting and insurance payment practices during his visit to Gramercy in May 1996 and the subsequent conference call with Beasley, Tenkhoff, and Barrett about the same subject. (*Id.*, ¶ 9).

Goodwin has provided sufficient summary judgment evidence to raise a disputed fact issue material to determining whether her employer knew of her protected activity. There is competent summary judgment evidence in the record that the conference call participants — Barrett, Beasley, and Tenkhoff — heard Goodwin's intracorporate report of her belief that Gramercy's pricing practices involved fraud or illegality. Goodwin and Barrett inconsistently recall whether she specifically mentioned fraud against the government because of practices involving insurance payments for Medicare patients, but the evidence is sufficient to preclude summary judgment as to this element of her retaliation claim.

### 3. The Causal Connection Between the Protected Activity and the Adverse Employment Action

Defendants correctly point out that Goodwin presents or identifies scant evidence that defendants terminated Goodwin's employment because she engaged in protected activity. Goodwin, a self-described "documenter," kept extensive contemporaneous records of the circumstances surrounding her encounters with Simons and her job termination, and submitted them as part of the summary judgment record. Goodwin's own version of events is that Simons, who had replaced Barrett as Gramercy's new administrator two weeks earlier,

asked Goodwin to complete the quarterly and year-end reports.[16]  Goodwin refused.  She told

Simons that these reports were the administrator's responsibility, not hers.  Simons repeated

her request that Goodwin complete the reports; Goodwin responded by telling Simons that

she had not previously completed some of the reports because the administrator had done

them; and that she would not do those reports unless and until that job was added to her

formal job description.  (Docket Entry No. 66, Goodwin Aff., ¶ 17).[17]  According to

Goodwin, the two continued arguing loudly until Goodwin "requested a conference with

[Simons supervisor] Becky Lee present."  (Id.).  Simons fired Goodwin for insubordination

the next time they met, January 2, 1997.

Goodwin claims that the conflict with Simons over the reports was pretextual and that

Goodwin was "set up to fail."  Goodwin does not dispute that the conflict over the reports,

as well as other disagreements with Simons, occurred.  As evidence of pretext, Goodwin cites

to an entry in her diary reflecting that shortly before she was fired, she had a conversation

with Starla Shinn, the business operations manager at the Travis facility in Houston where

Simons had previously served as administrator.  According to Goodwin, Shinn told her that

when Simons was appointed as Gramercy's administrator, she told Shinn, "When I get to

---

[16]     Goodwin's diary of events describes other conflicts after Simons's arrival at Gramercy, before the January 2, 1997 firing.  Goodwin swapped computers with Simons, which Simons protested. Goodwin asserts that Simons knew of the swap in advance, which Simons disputes, but it is clear that Simons was unhappy about the change.  (Goodwin Diary at 8).  Simons was unhappy that Goodwin used an on-line dial-up service's software on her office computer for her work and ordered "that no computer is to have it loaded but HERS."  (Id. at 6) (emphasis in original).  Simons objected to Goodwin delegating check-signing authority, (id. at 5), and to her using a computer consultant's services without permission.  (Id. at 5 & 6).

[17]     In her diary of events leading to her termination, Goodwin stated that she "added that my name was to go on the reports as having been completed by me."  (Goodwin Diary at 8).

Gramercy, there is one problem that I will fix immediately. . . Marie [Goodwin]."[18]  Shinn

testified that Simons did not talk with her about any plan or intent to terminate Goodwin's

employment.  "I don't think she was planning on terminating her.  I think that she was going

to let her know that she was the one in charge.  Carol was in charge, not Marie anymore."

(Docket Entry No. 72, att. A (Shinn Dep.) at 52).  This statement  does not create a genuine

issue of material fact as to a causal connection between Goodwin's protected activity and her

dismissal.

Goodwin and Simons testify consistently that Goodwin did not directly or specifically

tell Simons of her concerns regarding Gramercy's allegedly illegal practices.  Simons

testified that she did not have independent knowledge that Goodwin had reported her

concerns to anyone at Gramercy or Columbia/HCA.  (Docket Entry No. 55, att. C (Simons

Aff.)).[19]  Goodwin has provided no evidence that anyone other than Simons was involved in

the decision to terminate Goodwin's employment.  (Goodwin Dep. at 338).

Goodwin argues that even if she never told Simons of her concerns over illegal or

fraudulent activity involving Medicare funds, Simons had "access" to information regarding

Goodwin's protected activity.  Goodwin provides no evidence of Simons's "access" to

---

[18]     Shinn testified about this phone conversation with Goodwin,  recalling that "I remember her
— she was questioning as if she was either recording or taking notes.  It was very obvious that she was trying
to get information out of me."  Shinn asked Goodwin if she was recording the conversation: "She said, 'No'
or she acted like she didn't understand my question."  (Shinn Dep. at 51).

[19]     Simons testified, "Prior to and during the time I supervised Marie Goodwin, I never had
knowledge that she made any complaints regarding alleged illegal or unethical activity to anyone affiliated
with Gramercy Outpatient Surgery Center or any of the Defendants.  I never heard from any other employees
that Ms. Goodwin had any complaints or concerns regarding such activity."  (Simons Aff.).

Goodwin's intracorporate reporting.  Goodwin states that she raised the issue of "illegal practices" in administrators' meetings when Simons was present.  (Docket Entry No. 66, (Goodwin Aff.) ¶ 19).  Goodwin, however, does not identify when or where these meetings took place, who attended, what she said, or what type of illegal practice she raised.  Although Goodwin testified as to one administrators' meeting in Houston in late September 1996, at that meeting, she only asked where insurance overpayments went.  (Docket Entry No. 66, (Goodwin Dep.) at 241).

In her deposition, Goodwin appears to concede that Simons did not fire her for engaging in protected activity.  Rather, Goodwin stated that she thinks Simons fired her for refusing to perform illegal acts, not for making an intracorporate report about fraud against the government:

> Q:  If I understand your lawsuit, generally you think that you were terminated by Ms. Simons because in some way you had complained about illegal practices.  Is that your belief?
>
> A:  Not because I complained.
>
> Q:  Why do you think you were terminated?
>
> A:  I don't think.  I know.
>
> Q:  Okay.  What do you know to be the reason for your termination?
>
> A:  Right.  I know that I was terminated because I was refusing to do it and take part anymore in their illegal activities.

(Docket Entry No. 66, Goodwin Dep. at 249).

While Goodwin believes that she also engaged in protected activity by refusing to perform illegal practices, the evidence does not connect Goodwin's refusal to perform

"illegal activities" to her firing.  Goodwin worked under Simons for two weeks before being

dismissed.  Goodwin does not contend that she opposed any illegal practices during these two

weeks.  While Goodwin believes Simons fired her because Goodwin opposed or refused to

engage in practices before Simons's arrival at Gramercy, Goodwin offers only speculation

that this motivated Simons's decision:

> Q:    What activities were you refusing to take part in January or by January of 1997
> which you believe led to your termination?
>
> A:    Anything that involved the business operation that I would have to answer for,
> i.e., Medicare copayments, deductibles being waived, different pricing, free
> cases.  Basically that was it.
>
> Q:    And how is it you know that's why you were terminated?
>
> A:    Because I'm an adult.  I've been in the business world a long time.  You can
> see the writing on the wall.  Mr. Barrett was terminated two weeks prior.  All
> this came up as we were bringing up these issues.

(Goodwin Dep. at 249–50).  Subjective beliefs are not competent summary judgment

evidence.  *See Little*, 924 F.2d at 96 (conclusory allegations and subjective beliefs, even if

in good faith, are insufficient to satisfy the nonmoving party's burden on summary

judgment).

Goodwin primarily relies on comparing the timing of her firing with Barrett's to

demonstrate causation.  There are several problems with this argument.  First, months passed

between Goodwin's protected activity in May 1996 and her firing in January 1997.  Goodwin

provides no specifics as to any other instances in which she notified senior Gramercy

officials about fraud or illegality.[20]  The extended time from May 1996 to early January 1997

weakens an inference of causation between Goodwin's protected activity and her dismissal.

Second, Barrett's situation was far different from Goodwin's.  Barrett repeatedly raised

concerns with his supervisors at Columbia/HCA about free cases, discounting, waiving

copays and deductibles, sharing employees, and inflated equipment leases.  Barrett sought

outside legal advice about certain of these practices.  His contemporaneous notes reflect that

in response to his repeated requests for guidance from Columbia/HCA on allegedly illegal

activities, Columbia/HCA executives repeatedly deflected his inquiries.  The record reveals

that Barrett was far more direct, more insistent, more detailed, more aggressive, and more

involved than Goodwin in pressing Columbia/HCA on potentially illegal activities at

Gramercy.  Finally, the evidence does not link the people to whom Goodwin reported

government fraud with the person who made the decision to fire her.  In Barrett's case, by

contrast, the evidence showed that Barrett repeatedly sought guidance on potentially illegal

practices from Beasley, who fired him.

Simons fired Goodwin immediately after the two argued about who was responsible

for particular financial reports.  There is no dispute that Goodwin refused to prepare the

reports after her supervisor ordered her to do so; that she shouted at and argued with her

---

[20]     For example, Goodwin says she "raised concerns about the implications" of charging
Medicare patients different prices for procedures.  (Docket Entry No. 66 (Goodwin Aff.) ¶ 3).  Goodwin
"expressed these concerns to my supervisors in various meetings."  (*Id.*, ¶ 4).  Goodwin "discussed the
[overpayment] account with Corporate's accountant on numerous occasions."  (*Id.*, ¶ 12).  Goodwin "raised
the issue if [sic] illegal practices at several administrators meetings attended by Becky Lee, and Carol
Simons."  (*Id.*, 19).  None of these allegations detail what, where, or when Goodwin reported her suspicions
to Gramercy about illegal or fraudulent activity against the government.

supervisor; and that after refusing repeated requests to prepare the reports, she finally demanded that her job description be altered before she would consider doing so; and demanded that her supervisor's supervisor become involved in the discussion.  There is no suggestion that Goodwin refused to prepare the quarterly and year-end reports because she believed that she would thereby commit an illegal act.  Goodwin has not suggested that these reports had anything to do with an FCA violation.

Defendants assert that the undisputed facts show that Goodwin's employment was terminated for insubordination in defying Simons's request that Goodwin complete certain reports.  Goodwin does not dispute that this incident occurred or that she engaged in conduct that is fairly characterized as insubordinate behavior to a supervisor.  Other witnesses, including Clinical Director Hand, corroborate the incident that precipitated Goodwin's dismissal: "I remember telling Marie, after Carol left that — I told her to just keep her mouth shut and she would — she wouldn't get fired.  She had a temper.  But she couldn't keep her mouth shut."  (Docket Entry No. 55, att. K (Hand Dep.) at 71).  Shinn testified that "it was just kind of known by everybody that Marie was very abrasive and very demanding and didn't — looked up to no one.  There was nobody that was the authority over her.  And I think that was where — I think that was where the problem was going to come in."  (Shinn Dep. at 52).  According to Shinn, Simons fired Goodwin because "she refused to do some work and then there were words and — pretty harsh words coming from Marie and I think Carol let her go when she did that."  (*Id.* at 53).  Barrett himself acknowledge Goodwin's problems as an employee.  He sent an October 16, 1996 memo to his supervisor, Carla

Holden, listing a variety of problems to address.  The memo reads, "The last and most difficult issue has to do with our Business Officer Manager, Marie Goodwin."  Barrett described her as doing an "excellent job in collecting revenue" but "[t]he problem is that her people skills are not the best."  Barrett said he and Goodwin both agreed "she needed to work on her demeanor with the patients" but the "general consensus among our physicians was that Marie is rude and offends their patients."  Barrett wrote, "we must 'fish or cut bait'" and recommended moving Goodwin to corporate.  (Docket Entry No. 66, ex. 53 to Barrett Dep.).  Goodwin did not respond to these aspects of defendants' summary judgment motion and evidence.

In short, no evidence causally connects Goodwin's protected activity with her firing.  While Goodwin made an intracorporate report to Barrett and to certain Columbia/HCA officials, none of these individuals were involved in the decision to fire her.  The undisputed evidence shows that Goodwin was fired immediately after she refused to follow her supervisor's instructions and argued loudly and rudely with her supervisor.  Because Goodwin has failed to raise a fact issue as to an essential element of her FCA retaliation claim, summary judgment for defendants is appropriate.

## C.    The State-Law Wrongful Termination Claim

Goodwin also asserts a state-law claim that defendants terminated her employment because she refused to perform an illegal act.  *See Sabine Pilot Serv., Inc. v. Hauck*, 687 S.W.2d 733, 735 (Tex. 1985).  Goodwin contends that she was fired "within a few months after informing her Regional VP that she would not continue performing illegal acts and

would not be Columbia's fall guy."  (Docket Entry No. 66, p. 24).  Defendants respond that

Texas law bars Goodwin's *Sabine Pilot* claim because she has also argued that defendants

dismissed her for engaging in conduct protected by the FCA.  Because a *Sabine Pilot* claim

requires a plaintiff to plead and prove discharge solely because the employee refused to

commit an illegal act, courts view such claims as mutually exclusive of claims that other

impermissible reasons motivated the employee's dismissal.

A *prima facie* case of wrongful termination under *Sabine Pilot* requires a plaintiff to

prove that: (1) she was required to commit an illegal act that carries criminal penalties; (2)

she refused to engage in the illegality; (3) she was discharged; (4) the sole reason for her

discharge was her refusal to commit the unlawful act.  *White v. FCI USA, Inc.*, 319 F.3d 672,

676 (5th Cir. 2003).  Defendants point to *Robertson*, 32 F.3d at 952–53, to support their

argument that under Fifth Circuit authority, a plaintiff cannot simultaneously advance an

FCA retaliation claim and a *Sabine Pilot* claim.

In *Robertson,* the court held that the plaintiff had failed to prove two elements of his

FCA retaliation claim and that simply asserting this claim barred a *Sabine Pilot* claim:

> In *Sabine Pilot Service, Inc. v. Hauck*, 687 S.W.2d 733 (Tex. 1985), the Texas
> Supreme Court recognized an exception to the employment-at-will doctrine,
> which protects an employee who is discharged for the sole reason that the
> employee refused to perform an illegal act.  In *Pease v. Pakhoed Corp.*, 980
> F.2d 995, 997 n.1 (5th Cir.1993), we made clear that "an employee who
> alleges wrongful discharge for refusing to perform a criminal act cannot
> advance additional claims."  Thus, to warrant recovery under this narrow
> common law cause of action, the refusal to perform an illegal act must be the
> sole reason advanced for the plaintiff's discharge.  Robertson's assertion that
> he was fired for another reason — in retaliation for investigating a *qui tam*
> action — precludes his common law claim.  The district court therefore
> properly dismissed Robertson's wrongful discharge claim.

32 F.3d at 952–53.

Goodwin argues that *Robertson* and *Pease* stand only for the proposition that an employee cannot recover on both an FCA retaliation and *Sabine Pilot* claim, but may still permissibly plead alternate violations consistent with Rule 8(a).  See FED. R. CIV. P. 8(a) ("Relief in the alternative or of several different types may be demanded.").  Goodwin also notes that one court in this district has permitted such alternative pleading, and another expressly disagreed with *Robertson* and *Pease*.  *See Laurence v. Atzenhoffer Chevrolet*, 281 F. Supp. 2d 898, 900 (S.D. Tex. 2003) (permitting plaintiff to plead alternative *Sabine Pilot* and ADEA theories of liability but to recover on only one); *Hopkins*, 985 F. Supp. at 708 n.1 (stating "[t]his Court expressly disagrees with this part of the *Robertson* holding" and denying employer's motion to dismiss FCA retaliation claim, noting "because a finding by this Court that Plaintiff cannot pursue her claim under § 3730(h) will preclude her from seeking recovery for wrongful discharge under *Sabine Pilot*, the question whether Plaintiff's § 3730(h) retaliation claim is viable on these facts gains added significance.").

The Fifth Circuit authority is clear and consistent.  "Under Texas law, an employee who alleges wrongful discharge for refusing to perform a criminal act cannot advance additional claims."  *Pease*, 980 F.2d at 997 n.1.  As the court in *Pease* stated, "Our recent decision in *Guthrie v. Tifco Industries*, 941 F.2d 374, 379 (5th Cir. 1991) is determinative: 'Because the refusal to perform an illegal act must be the sole reason for the plaintiff's discharge, Guthrie's claims of age discrimination and wrongful discharge are mutually exclusive.'"  Defendants have identified no Fifth Circuit cases to undermine *Sabine Pilot*'s

exclusive remedy, although dicta in one case suggests the possibility that a plaintiff might pursue both. *See Willy v. Coastal Corp.*, 855 F.2d 1160, 1167 n.10 (5th Cir. 1988) (stating, in a preemption discussion, that "the *Sabine Pilot* remedy may sometimes in practice supplement but does not appear to directly conflict with any federal remedy"). Binding Fifth Circuit authority, no matter how much this court disagrees with it, supports the dismissal of this claim.

Even apart from this obstacle to proceeding on the *Sabine Pilot* claim, the same problems noted above with the record evidence as to a causal link between Goodwin's resistance to, and complaints about, what she believed to be illegal acts, support summary judgment as to this claim. The record does not support Goodwin's argument that she was required to perform specific illegal acts. In her deposition, Goodwin concedes that supervisors Barrett, Simons, Rebecca Lee, Carla Holden, and Ashworth never asked or directed her to do anything she thought was illegal. (Goodwin Dep. at 254–55). Goodwin identified one incident in which she refused to give a doctor two free cases in one month, but nothing in the summary judgment record connects this incident to Goodwin's termination. (*Id.* at 253–54). Even accepting her testimony that she was required to acquiesce when doctors discounted prices for procedures, waived insurance copayments, or waived insurance deductibles, these events all occurred months before she was fired, and there is no evidence suggesting that the doctors put pressure on Simons to fire Goodwin.

The evidence as to Goodwin's quarrel with Simons and her refusal to comply with Simons's directive to complete certain reports, and that this quarrel and refusal immediately

preceded and led to Goodwin's firing, is undisputed.  Goodwin agrees that this incident

occurred and does not dispute that she engaged in such behavior.  Given the Fifth Circuit's

*Robertson* decision that a plaintiff cannot simultaneously advance *Sabine Pilot* and FCA

retaliation claims, and the undisputed evidence as to Goodwin's conduct immediately before

she was fired, this court grants summary judgment in favor of defendants on Goodwin's

wrongful termination claim.

### D.    The Claim of Intentional Infliction of Emotional Distress

Goodwin claims that defendants' "extreme and outrageous misconduct in asking

Relators to commit illegal acts proximately caused Relators to suffer severe emotional

distress.  The Defendants acted intentionally to harm and upset Relators, and such conduct

constitutes infliction of emotional distress." (Pl.'s Third Amend. Compl.).  The basis for this

claim matches the conduct made the basis for Goodwin's FCA retaliation and wrongful

dismissal claims.  Goodwin contends that Simons caused her emotional distress because

during the two weeks that Simons supervised Goodwin, "I felt my job was being threatened

every day that she was there."  (Docket Entry No. 55, (Goodwin Dep.) at 359).  Goodwin

specifically identified "the way [Simons] spoke with me, the way she yelled, the way she

terminated me."  (*Id.*).  Goodwin also claims that Rebecca Lee caused her emotional distress

"only in the respect that I expected Becky to at least acknowledge or listen to what. . . was

going on from my end and acknowledge the grievance." (*Id.*).  Ashworth allegedly inflicted

emotional distress because she gave Goodwin "the feeling from our discussion on the phone

and then from what Ms. Simons said that for some reason Pam [Ashworth] was laying all this

overpayment stuff on me." (*Id.* at 360).   Beasley also inflicted emotional distress on Goodwin because "[h]e did not eliminate the problem that I was having trying to walk a fine line on pleasing the doctors and keeping my job." (*Id.*).   Goodwin's emotional distress allegations target these four individuals as well as individual Gramercy doctors who are not defendants. (*Id.* at 361).  Goodwin asserts that her doctor prescribed Prozac as a result of the distress she suffered. (*Id.* at 364).

Defendants argue that Goodwin may not recover on an independent claim for intentional infliction of emotional distress because the essence of her allegations is not independent from her other causes of action, citing *Hoffman-LaRoche, Inc. v. Zeltwanger*, 144 S.W.3d 438 (Tex. 2004).  Defendants add that the FCA statute provides for emotional distress damage recovery, so that an independent claim of emotional distress would improperly maximize Goodwin's potential financial recovery.  In response, Goodwin states that she "has elected not to pursue this claim in order to avoid issues of duplicate recovery of emotional damages." (Docket Entry No. 66, p. 26).

Additionally, under clearly applicable law, the kind of work-related disagreements and pressure that Goodwin allegedly experienced does not approach the level necessary to raise a fact issue as to intentional infliction of emotional distress.  To be liable for intentional infliction of emotional distress, an actor's conduct must be "extreme and outrageous." *See Wornick Co. v. Casas*, 856 S.W.2d 732, 733 (Tex. 1993).  "Extreme and outrageous" conduct is that which is "atrocious," "beyond the bounds of decency," and "utterly intolerable in a civilized society." *Id.* at 734.  In the employment context, a claim for intentional infliction

of emotional distress will not be supported by the broad range of conduct labeled as "mere employment disputes."  *Id.*  As the Fifth Circuit stated in *Johnson v. Merrell Dow Pharmaceuticals, Inc.*, 965 F.2d 31 (5th Cir. 1992):

> In order to properly manage its business, an employer must be able to supervise, review, criticize, demote, transfer and discipline employees.  Not all of these processes are pleasant for the employee.  Neither is termination . . . . An employer will not be held liable for exercising its legal right to terminate an employee, "even though he is well aware that such [action] is certain to cause emotional distress."

*Id.* at 34.  Defendants' motion for summary judgment on this independent claim is granted.

## IV.  Conclusion

Defendants' motion to strike is denied.  (Docket Entry No. 73).  Defendants' motion for summary judgment is granted.  (Docket Entry No. 55).  Final judgment is entered by separate order.[21]

SIGNED on August 10, 2005, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge

---

[21]    Columbia/HCA's motion in limine is denied as moot.  (Docket Entry No. 76).  Goodwin's request for discovery sanctions contained in her supplemental summary judgment response is denied. (Docket Entry No. 83).